UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DYNA TORQUE TECHNOLOGIES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-1529 |
| | § | |
| HELIX ENERGY SOLUTIONS GROUP, INC., | § | |
| | § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER

Pending before the Court is the motion to dismiss for lack of subject matter jurisdiction (Doc. 12) filed by Defendant Helix Energy Solutions Group, Inc. ("Helix"). Plaintiff Dyna Torque Technologies, Inc. ("Dyna Torque") filed a response in opposition to the motion (Doc. 17), and Helix filed a reply in support (Doc. 18).

Having considered the motion, the evidence in the record, and the applicable law, the Court concludes that the motion should be granted.

### I.   Background

The allegations underlying this case involve three entities, two agreements, and one purchase order. The entities include the two named parties and a nonparty, Murphy Exploration & Production Company–USA ("Murphy"). Their relationship arises out of an offshore pipeline construction project and is governed by two separate agreements, a contract between Murphy and Helix (the "MH-Contract") and a master service agreement between Helix and Dyna Torque (the "MSA"). In June 2007, Murphy signed its contract with Helix for Helix to construct an offshore oil pipeline in the Gulf of Mexico. In support of that project, in August 2007, Helix

reached its agreement with Dyna Torque, a provider of automated welding services. The MSA stated generally that

> Helix is engaged in the business of various maritime operations including commercial diving, construction and pipeline work, equipment rental, labor crews, and other services for itself or the account of others; and

> . . . Helix or other parties for whom or with whom Helix is working may desire the services of [Dyna Torque], including but not limited to the rental and/or purchase of welding services (which in each case shall be limited to single head welding services and technologies), power sources, wire feeders, welding bands, and related goods and services (including manpower and support, at such levels to be mutually agreed with [Dyna Torque]).

Doc. 1-2 at 4. The MSA further stipulated that it

> does not obligate Helix to order works and/or equipment or materials from [Dyna Torque], nor does it obligate [Dyna Torque] to accept such orders, but it, together with any applicable work order which shall form a part hereof, shall control and govern all work accepted by [Dyna Torque] and shall define the rights and obligations of Helix and [Dyna Torque], during the term hereof. In the event of conflict, <u>this contract shall take precedence</u> over any work order, delivery ticket, or any other document issued by [Dyna Torque].

Doc. 1-2 at 5 (emphasis in original). The MSA also contained an arbitration clause:

> Any dispute arising under this Contract that is not settled by negotiation of the parties shall be settled in accordance with the provisions of Helix's Contract with its customer if the dispute affects the customer. In the absence of any such provisions and in cases in which the customer is not affected, any such dispute shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association before an arbitrator selected in accordance with such rule. It is the preference of the parties that all such arbitration be conducted in Houston, Texas.

Doc. 1-2 at 12. Pursuant to the MSA, on October 17, 2007, Dyna Torque received a purchase order from Helix "covering the qualification of fabrication procedures." Doc. 17 ¶ 4.13. In November 2007, after events that are unimportant to the motion presently before the Court, Helix canceled its contract with Dyna Torque.

As a result of this cancellation, on October 1, 2008, Dyna Torque filed suit in state court alleging breach of contract, promissory estoppel, breach of duty of good faith and fair dealing, a breach of duty to cooperate, fraud, tortious interference with a contract, and a claim on a sworn account. *In re Helix Energy Solutions Grp., Inc.*, 303 S.W.3d 386, 399 (Tex. App. 2010). After the trial court denied Helix's motion to stay and compel arbitration, Helix filed a petition for writ of mandamus, and the appellate court "direct[ed] the trial court to vacate its order . . . and enter a new order" staying the litigation and compelling arbitration. *Id.* at 404. The arbitration hearing was set to begin on Monday, May 21, 2012. Doc. 1 ¶ 6.16. On Friday, May 18, 2012, Dyna Torque filed this suit seeking, inter alia, "a Temporary Restraining Order (TRO) requesting that the Court enjoin Helix from pursuing its claims against Dyna Torque [sic] in arbitration," Doc. 1 ¶ 8.06, which, after a hearing on May 21, was denied, *see* Doc. 8. Helix now files this motion to dismiss for lack of subject matter jurisdiction.

## II.    Legal Standard

It is fundamental that federal courts must establish subject matter jurisdiction prior to reaching the substantive claims of a lawsuit. *Arena v. Graybar Elec. Co., Inc.*, 669 F.3d 214, 223 (5th Cir. 2012). If the court lacks either the statutory or constitutional authority to adjudicate a claim, then the claim shall be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1). *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005). When considering a jurisdictional challenge, a "court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004). Thus, a court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the

court's resolution of disputed facts." *Voluntary Purchasing Grps., Inc. v. Reilly*, 889 F.2d 1380, 1384 (5th Cir. 1989). The burden of proof lies with the party asserting jurisdiction. *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012).

## III. Discussion

Dyna Torque asserts two bases for this Court's subject matter jurisdiction: (i) diversity of citizenship and (ii) an underlying maritime contract. Doc. 1 ¶¶ 4.02-.03. The first basis can be disposed of immediately, as both parties have their principal place of business in Texas. *See* Doc. 1 ¶¶ 2.01-.02; 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every State and foreign state . . . where it has its principal place of business."). The second involves questions of fact and requires examination of the terms of the contract. *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011).

Only if the underlying agreement is a maritime contract can the dispute implicate admiralty jurisdiction. *J.A.R., Inc. v. M/V Lady Lucille*, 963 F.2d 96, 98 (5th Cir. 1992). "A maritime contract is a contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment." *Id.* (internal quotation marks and alterations omitted). Moreover, "[t]he fundamental interest giving rise to maritime jurisdiction is the protection of maritime *commerce*." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 25 (2004) (internal quotation marks omitted). Therefore, the only issue before the Court is whether the contract giving rise to the parties' dispute can, according to this standard, be defined as maritime in nature. Dyna Torque attempts to show the existence of a maritime contract via three avenues: (i) the terms of the MH-Contract; (ii) the nature of Dyna Torque's work for Helix under the MSA; and (iii) Helix's admission that maritime law applies to the two agreements.

Dyna Torque spends most of its effort discussing the MH-Contract, arguing that Helix "bound itself to extend the forum selection clause under the MH-Contract to Dyna Torque." Doc. 17 ¶ 4.1. Aside from Dyna Torque's repeated confusion between forum selection and subject matter jurisdiction, it fails to show that these concepts can even be analyzed according to the MH-Contract. In making its argument, Dyna Torque relies exclusively on *Norfolk Southern Railway Co. v. Kirby* for the proposition that "[w]hen a maritime contract extends its provisions to additional parties, the maritime contracts [sic] provisions apply to the subcontractor, even if the subcontractor's work was entirely inland." Doc. 17 ¶ 4.1.  This proposition cannot be accepted, however, not only because it is an overly broad restatement of the holding in *Kirby* but also because, in this case ,it is inapplicable. There, the question was whether a limitation of liability clause in both the main contract and in the subcontract applied to a sub-subcontractor. *Kirby*, 543 U.S. at 30. In concluding that it did, the U.S. Supreme Court proceeded in two broad steps: first, finding that the contracts were inherently maritime in nature; second, finding that the parties' intent was to extend the limitation of liability clause to every entity involved. Neither step can be taken here.

Regarding the first step, both of the contracts in *Kirby* were for the carriage of goods for the entire route from Sydney, Australia to Huntsville, Alabama. *Id.* at 18-21. The Supreme Court defined such contracts as maritime "because their primary objective [was] to accomplish the transportation of goods by sea," reasoning that making the final leg of the journey by land did "not alter the essentially maritime nature of the contracts." *Id.* at 24 (citing G. Gilmore & C. Black, Law of Admiralty 31 (2d ed. 1975) ("Ideally, the admiralty jurisdiction over contracts ought to include those and only those things principally connected with maritime transportation" (alterations omitted)). That is not the situation here, where the scope of the main contract, the

MH-Contract, is described as the "installation engineering, construction, fabrication, and installation of [pipelines]." Doc. 1-3 at 11. Discussing this type of work, the Supreme Court has said, "There is nothing inherently maritime about [building and maintaining pipelines]. They are also performed on land, and their nature is not significantly altered by the marine environment, particularly since exploration and development of the Continental Shelf are not themselves maritime commerce." *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 425 (1985) (footnote omitted). The Fifth Circuit later echoed this comment, declaring "that oil and gas production is 'not even suggestive of traditional maritime affairs.'" *Coastal Prod. Servs., Inc. v. Hudson*, 567 F.3d 752, 753(5th Cir. 2009) (quoting *Herb's Welding*, 470 U.S. at 422). Just last month, the Fifth Circuit offered a reminder that "[t]he Supreme Court has stated in no uncertain terms that 'exploration and development of the Continental Shelf are not themselves maritime commerce.'" *Barker v. Hercules Offshore, Inc.*, 706 F.3d 680, 688 (5th Cir. 2013) (quoting *Herb's Welding*, 470 U.S. at 425). In sum, there is no legal support for Dyna Torque's conclusion that the MH-Contract is maritime in nature, and, even if there were, there is still the obstacle presented by the second step in *Kirby*: contractual interpretation.

In *Kirby*, the action was brought by the cargo owner, i.e., the hiring party in the main contract, pursuant to the terms of that contract. The Supreme Court determined from the language of the contract that the intent of the parties, including the cargo owner, was to extend the agreement's liability limitation to any entity's performance under the agreement. *Kirby*, 543 U.S. at 31. Here, Dyna Torque, a subcontractor, brings this action alleging a breach of the subcontract but attempting to fit under the umbrella of the main contract. As in *Kirby*, these agreements "must be construed like any other contracts: by their terms and consistent with the

intent of the parties." *Id.* In this case, the relevant terms and the parties' intent are best construed by reading the contract to which Dyna Torque actually agreed: the MSA.

The MSA, however, cannot be viewed in isolation, as it was written as a framework for subsequent contracts that would result from future purchase orders. *See* Doc. 1-2 at 5 (stating that the MSA, "together with any applicable work order which shall form a part [thereof], shall control and govern all work accepted by [Dyna Torque]"); *see also Matte v. Zapata Offshore Co.*, 784 F.2d 628, 630 (5th Cir. 1986) (concluding that a master service agreement that did not obligate either party to order or accept work "was not a binding contract but 'merely sets out the rules of the game in the event the parties decide to play ball'" (quoting *Page v. Gulf Oil Corp.,* 775 F.2d 1311, 1315 (5th Cir. 1985))). Consequently, it is the specifics of these purchase orders pursuant to the MSA that determines whether the underlying contract is maritime in nature. Dyna Torque presents only one such order and describes it in one line: "On October 17, 2007, Dyna Torque received a Purchase Order covering the qualification of fabrication procedures." Doc. 17 ¶ 4.13. This simply is insufficient to show the existence of a maritime contract. Considering that Dyna Torque's work, automated welding services, was one step removed from activity that itself is not inherently maritime, its description of the purchase order falls well short of establishing the existence of a maritime contract.

Third, Dyna Torque argues that Helix stipulated that maritime law applies, both to the MH-Contract, Doc. 17 ¶ 4.9, and to the MSA, Doc. 17 ¶ 4.14. In addition to being factually inaccurate, this argument is legally flawed. First, the argument reverses the proper order of analysis for maritime jurisdiction and choice of law. *See St. Paul Fire & Marine Ins. Co. v. Bd. of Comm'rs of Port of New Orleans*, 418 F. App'x 305, 307 (5th Cir. 2011) (stating the issue as "whether the district court properly determined that it had admiralty jurisdiction, which in turn

informs the choice of law analysis"). Second, it is a party's burden to prove subject matter jurisdiction, not its right to declare it. *See Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 786 (5th Cir. 2012) ("Parties may neither confer subject matter jurisdiction on the district court nor strip it of such jurisdiction by agreement or waiver." (quoting *Buchner v. FDIC,* 981 F.2d 816, 818 (5th Cir. 1993) (alterations and internal quotation marks omitted)).

Finally, Dyna Torque's claim that this Court has "exclusive jurisdiction" over its contractual dispute with Helix, Doc. 1 ¶ 4.01, is belied by Dyna Torque's own October 1, 2008 filing in state court asserting the same causes of action, *see In re Helix*, 303 S.W.3d at 393. In fact, the timing of Dyna Torque's complaint indicates that the desire to avoid arbitration, not the issue of subject matter jurisdiction, provides the real motivation behind this suit. It was not until after the Fourteenth Court of Appeals in Houston stayed litigation and compelled arbitration, and just before the arbitration hearing date, that Dyna Torque filed this suit seeking a TRO and claiming that this Court has exclusive jurisdiction. Of course, even if this Court had such jurisdiction, it would still be precluded from considering any of these issues, as they have already been addressed in state court, where a final judgment was issued on September 26, 2012.[1] *See*

---

[1] Helix states that this Court also lacks jurisdiction under the *Rooker-Feldman* doctrine, but that doctrine is inapplicable here. In 2006, the U.S. Supreme Court clarified that under this doctrine, "lower federal courts are precluded from exercising appellate jurisdiction over *final* state-court judgments" that are "rendered *before* the district court proceedings commenced." *Lance v. Dennis*, 546 U.S. 459, 460, 463 (2006) (emphases added). The decision over which this Court would arguably be exercising appellate jurisdiction, *In re Helix Energy Solutions Group, Inc.*, 303 S.W.3d 386 (Tex. App.--Houston [14th Dist.] 2010), was final as to the issue of arbitration but was not a final judgment. That judgment was issued on September 26, 2012, *see* Doc. 18-2, *after* the district court proceedings commenced; thus, *Rooker-Feldman* does not apply. This does not mean, however, that the state court decisions have no preclusive effect. Although, under Federal Rule of Civil Procedure 8(c), "res judicata is an affirmative defense that must be pleaded, not raised *sua sponte*," the Fifth Circuit has "recognize[d] two limited exceptions to this rule." *Mowbray v. Cameron County, Tex.*, 274 F.3d 269, 281 (5th Cir. 2001). Illustrating one exception, in *LaCroix v. Marshall County, Mississippi*, "[t]he defendants did not specifically plead res judicata in their answer" only "because the state-court judgment had not yet become final"; in other words, "the defense was not available to them when they filed their answer." 409 F. App'x 794, 799 (5th Cir. 2011). Instead, "they asked the district court to dismiss the case on abstention grounds, pending resolution of the state-court claims. . . . Res judicata became an issue when the LaCroixs asked the district court to reconsider its abstention ruling in light of the state court's intervening final judgment." *Id.* The Court of Appeals held that this situation "[fell] squarely within the second exception to the general requirement that res judicata be affirmatively pled." *Id.* This case offers a similar scenario: res judicata was not available to Helix when it filed its answer; Helix requested dismissal on other

Doc. 18-2. Regardless, as there is no subject matter jurisdiction, Dyna Torque cannot survive this motion to dismiss.

IV. **Conclusion**

For the foregoing reasons, it is hereby

**ORDERED** that Defendant's motion is granted and Plaintiff's complaint **DISMISSED**.

SIGNED at Houston, Texas, this 20th day of March, 2013.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

---

preclusive grounds; the state court issued an intervening final judgment; and, in that final judgment, the state court resolved the issues of arbitrability, breach of contract, promissory estoppel, and fraud that Dyna Torque raised in its federal complaint.